STATE OF CONNECTICUT *v.* MAXIMINO VILLAFANE

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued June 1—decision released September 21, 1976

*L. Scott Melville,* special public defender, for the appellant (defendant).

*Joseph T. Gormley, Jr.,* chief state's attorney, with whom was *Robert E. Beach, Jr.,* assistant state's attorney, for the appellee (state).

BOGDANSKI, J. A jury found the defendant, Maximino Villafane, guilty of murder in the first degree in violation of General Statutes § 53-9 (repealed, 1969 Public Acts, No. 828, § 214, effective October 1, 1971). In his appeal from the judgment rendered the defendant has raised and briefed issues concerning alleged errors in the court's denial of several pretrial motions, in its rulings on evidence, and in its charge.

The basic facts of this case, as disclosed by the evidence referred to in the briefs, are summarized below. Other facts which are necessary to our determination of particular issues raised will be later set out where warranted.

Shortly before 1 a.m. on April 17, 1971, Mario Campolucci, the proprietor of Bud's Bar & Grill in Bridgeport, was preparing to close the bar for the night. Present in the bar at that time were Campolucci, Fred Jarvis, Donald Deno, a couple, and a man who turned out to be a robber. The latter person was sitting at the end of the bar farthest from the entrance. At approximately 12:50 a.m. Campolucci asked that man, "What do you want? I am closing." The man responded by placing a handgun in Campolucci's back and ordering him to empty the cash register. Campolucci obeyed: he removed money from the cash register and handed it to the gunman. The gunman then went to the front of the bar and grill, pointed his gun down the length of the bar, and warned everyone not to move.

At that point, Donald Deno, apparently unaware that the holdup had taken place, was preparing to leave. The gunman ordered him to remain where he was and to put his wallet on the bar. Deno complied. As the gunman left, Deno threw a jar at

him and chased after him. Shortly thereafter, shots were heard and Deno was found wounded, lying in the street. On October 23, 1971, he died as a result of the bullet wounds.

Antonio Amaro, who on April 17, 1971, lived in the vicinity of Bud's Bar & Grill, heard the shots. He looked from his window and saw a man with a gun across the street from the bar. He went to his door, opened it less than halfway, and saw the man get into a car.

There were no significant developments in the case until April 28, 1971. On that day, Detective Donald R. Menard of the Bridgeport police was told by a confidential informant that "the word on the streets" was that the person responsible for the shooting was named Max and that he was the same person who had been involved in a homicide in Easton. Menard relayed this information to his superiors, including Captain Willard Stevane. Stevane believed that the person referred to by the informant may have been the defendant, Maximino Villafane, who was involved in a prior homicide in Easton.

To locate the whereabouts of Villafane, Officers John J. Connors and Robert J. Cafferty went to the Juvenile Court in Bridgeport and talked with James Middleton, a parole officer with the state department of children and youth services (hereinafter DCYS). Middleton told them that Villafane was on parole and was presently living in Puerto Rico. The officers then went to Villafane's last Bridgeport address, which was his parents' home at 229 Olive Street, at noontime on April 28, and saw the defendant sitting there on the front porch. That same day, the police called David W. Scott, the supervisor

of parole for DCYS, to ascertain Villafane's parole status and were informed that by being in Bridgeport, Villafane had violated his parole. Scott was aware that Villafane had previously been involved in a homicide and that he was considered to be dangerous, and he asked the police to pick him up for return to the reformatory.

On being informed that Villafane took his mother to work between 6 and 6:30 a.m., Officers Connors and Cafferty were dispatched to take him into custody on the following morning. On April 29, 1971, they arrived at the Villafane residence and waited outside in their car. At 6:30 a.m., the defendant's brother and mother came out of the house and started to get into a car. The officers approached and inquired as to the whereabouts of the defendant. They were told that the defendant was upstairs asleep and, accompanied by the mother and brother, they went into the bedroom, took Villafane into custody as a parole violator and read him his constitutional rights. He was handcuffed and transported to police headquarters.

As the officers were escorting Villafane into the area of the police station, Fred Jarvis, one of the witnesses to the holdup, happened to be passing by on his way to work and saw the trio. Jarvis immediately approached the officers and identified the defendant as the gunman who had held up Bud's Bar & Grill.

A lineup was then conducted. There were seven participants in the lineup. The witnesses Jarvis, Campolucci and Amaro viewed the lineup individually. All three identified the defendant. Shortly thereafter, the defendant was arrested for the shooting at Bud's Bar & Grill.

On December 6, 1971, Villafane was indicted by a grand jury for the crime of murder in the first degree. He thereafter filed a combined plea in abatement and motion to quash the indictment, which was granted by the trial court. On appeal to this court, the decision was reversed and the indictment was reinstated. *State* v. *Villafane,* 164 Conn. 637, 651, 325 A.2d 251.

## I

Prior to trial, the defendant moved to suppress all identification evidence resulting from the lineup on the ground that the arrest leading to his presence at the lineup was illegal. That motion was denied. The defendant claims that the court erred in refusing to suppress that evidence.

Testimony at the hearing on the motion to suppress revealed that on October 10, 1967, Villafane had been adjudicated a delinquent by the Juvenile Court in Bridgeport and was committed to the Connecticut School for Boys. He was under the general supervision of David W. Scott. Beginning in 1969, the Connecticut School for Boys came under the jurisdiction of DCYS. On January 25, 1971, Villafane was granted a "conditional release" to live with his grandparents in Puerto Rico on condition that he remain there and not return to Bridgeport unless given permission to do so. When Scott learned of the defendant's return to Bridgeport, he decided that parole should be revoked and asked the Bridgeport police to take Villafane into custody.

The defendant argues that when the officers arrived at his parents' house at 6 a.m. on April 29, 1971, they had no probable cause to arrest him for the shooting at Bud's Bar & Grill; that the

police officers had no statutory authority to detain a juvenile parole violator without an arrest warrant; that even assuming that the commissioner of DCYS had legislative authority to authorize the police to pick up a juvenile parole violator, the detention in this case was accomplished through an unlawful delegation of that authority; that the defendant's arrest at 6:30 a.m. was therefore illegal; and that the subsequent identifications were obtained by virtue of that unlawful arrest and should have been suppressed.

The state agrees that there was no probable cause to arrest the defendant at 6:30 a.m. on April 29, 1971, on a charge concerning the shooting at Bud's Bar & Grill. The state contends, however, that the defendant's detention as a juvenile parole violator was lawful, but that even if it were not, the spontaneous identification by Jarvis outside the police station "purged the taint" of the original detention.

Public Acts 1969, No. 664, created DCYS and repealed a number of statutes which granted specific powers and duties to a number of juvenile authorities. In place of those specific powers, the legislature granted flexible and broad authority to the commissioner of DCYS. The department was intended to provide "a flexible and creative program for the placement, care and treatment of children committed by the juvenile court to the department"; General Statutes § 17-412 (b); the commissioner, or his designee, was given the power to transfer children to different facilities in or outside the state, but at all times the transferred children would be deemed to be in the custody of the commissioner. General Statutes §§ 17-418 (a), 17-420. In addition, the commissioner was given "such other powers and duties as are necessary to administer the

department and implement the purposes of this chapter." General Statutes § 17-415 (r). The defendant concedes that under chapter 310 of the General Statutes, the commissioner had broad powers concerning children under his supervision. He maintains, however, that the commissioner did not have the authority to request the police to pick up a juvenile parole violator. He asserts that police officers can arrest for criminal offenses only; that no statute declares a juvenile parole violation a criminal offense; and that the defendant's arrest without a warrant was in violation of his fourth amendment rights.[1]

While it is true that at the time when the defendant was initially taken into custody there was no express statutory authority permitting police officers to detain juvenile parole violators, we do not agree that the police were without the power to do so. To hold otherwise would be to deny the commissioner the power to enforce his decisions and render ineffective his power to implement the purposes of chapter 310 of the General Statutes. In the event that a juvenile parole violator is considered dangerous, it would be unreasonable to require a parole official, often untrained as to the necessary precautions to be taken in such a situation, to endanger himself or the public in an attempt to take such a violator into custody. The logical and reasonable thing to do would be for the parole authorities to call the police for assistance.

Under article V of the Interstate Compact on Juveniles; General Statutes § 17-76; police were and are empowered to detain juvenile parole vio-

---

[1] Today there is express statutory language permitting the police to return a juvenile parole violator to actual custody. General Statutes § 17-415b.

lators from other jurisdictions. While that statute is not applicable to the facts of the present case, it does indicate a legislative intent that it is proper for police to aid juvenile authorities. Moreover, we perceive no relevant distinction between allowing a parole officer to apprehend a violator and allowing the police to do so since the juvenile parolee is at all times in the constructive custody of the commissioner. An "arrest" of a parole violator is "a mere transfer of the subject from constructive custody into actual or physical custody," and is not subject to the same controls as are imposed upon the arrest of an ordinary citizen. *People* v. *Denne,* 141 Cal. App. 2d 499, 297 P.2d 451; see, e.g., *Reeves* v. *Turner,* 28 Utah 2d 310, 501 P.2d 1212.

Under the circumstances of the present case, where the defendant was known to have been previously involved in a homicide and was considered dangerous, it was reasonable for the police to have been requested to detain the defendant. "[A] parole officer may properly request police assistance in the apprehension and investigation of a parole violator." *Reeves* v. *Turner,* supra, 313; see, e.g., *People* v. *Kanos,* 14 Cal. App. 3d 642, 92 Cal. Rptr. 614.

The defendant further claims that even if DCYS had authority to authorize the police to arrest juvenile parole violators, the detention in the present case was nevertheless unlawful because the commissioner himself did not authorize the revocation of parole nor the pickup by the police.

As previously noted, according to § 17-412 (b) of the General Statutes, the department was to provide a flexible program for the placement of children, and under § 17-415, the commissioner was to "adopt and enforce regulations to effectuate the

purposes of this chapter [310]." On November 20, 1970, the commissioner adopted a policy-statement-type regulation setting forth the procedures to be employed in cases of parole revocation. In emergencies, parole could be revoked by the superintendent of the Connecticut School for Boys or could be conditionally revoked by a parole officer. It is undisputed that both Scott and Middleton were parole officers, and it is evident that they felt that an emergency situation existed when the defendant was discovered to be in Bridgeport. Consequently, their actions were in accord with the regulation issued by the commissioner.

The defendant argues, however, that the regulation of November 20, 1970, was not published or approved by the Attorney General in accordance with General Statutes § 4-46 (repealed, 1971 Public Acts, No. 854, § 20, effective January 1, 1972) and was, therefore, of no effect. The regulation in question related solely to the internal management of DCYS and was concerned with what duties were to be performed by the various personnel. General Statutes § 4-41 (repealed 1971 Public Acts, No. 854, § 20, effective January 1, 1972) exempted such matters from the requirements of § 4-46, and, consequently, neither publication nor approval was required. See *Roy* v. *Mulcahy*, 161 Conn. 324, 328 n.1, 288 A.2d 64.

Even if Villafane's initial detention were to be considered unlawful, it does not follow that the evidence of the identifications by Jarvis, Amaro and Campolucci was inadmissible since that evidence could not be characterized as the fruit of that detention. To be sure, "but for" the fact that Villafane was brought to the police station at the time that he was, Jarvis would not have recognized him as

he was passing on the street, but evidence is not the " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun* v. *United States,* 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441, quoting from Maguire, Evidence of Guilt, p. 221.

The question whether the discovery of evidence is sufficiently attenuated from an illegal act to be admissible under *Wong Sun* must be decided on the facts of each case. Relevant considerations in determining whether the "taint has been purged" include the temporal proximity of the arrest and the discovery of the evidence, "the presence of intervening circumstances, see *Johnson* v. *Louisiana,* 406 U.S. 356, 365, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972), and, particularly, the purpose and flagrancy of the official misconduct." *Brown* v. *Illinois,* 422 U.S. 590, 604, 95 S. Ct. 2254, 45 L. Ed. 2d 416; see, generally, Pitler, " 'The Fruit of the Poisonous Tree' Revisited and Shepardized," 56 Cal. L. Rev. 579. In the present case, it is evident that the chance confrontation and identification by Jarvis led to the subsequent lineup identifications. The Jarvis on-street identification, which was not a deliberate exploitation of any illegal conduct, established such a causal attenuation between the arrest and the subsequently acquired evidence as would "purge the taint" of that arrest had it been illegal. See, e.g., *Johnson* v. *Louisiana,* 406 U.S. 356, 365, 92 S. Ct. 1620, 32 L. Ed. 2d 152; see also

*Brown* v. *Illinois,* supra; *United States* v. *Parish,* 468 F.2d 1129, 1138-39 (D.C. Cir.); *United States* v. *Bacall,* 443 F.2d 1050 (9th Cir.), cert. denied, 404 U.S. 1004, 92 S. Ct. 565, 30 L. Ed. 2d 557; *Young* v. *United States,* 435 F.2d 405 (D.C. Cir.); *State* v. *Thomas,* 491 S.W.2d 328 (Mo.).

Two additional claims concerning the defendant's arrest require little discussion. The defendant claims that the parole violation arrest was a "mere pretext" used to seize the defendant for investigation of the shooting without probable cause. That claim is not substantiated by the record. At the time of the initial detention, there was no plan to hold a lineup. The identification by Jarvis, however, drastically and understandably changed that plan. The defendant also contends that the detention after the Jarvis identification was illegal because, having probable cause to arrest at that time, the police failed to procure a warrant until after the lineup. "[T]he Court 'has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant.' *Gerstein* v. *Pugh,* 420 U.S. 103, 113 [95 S. Ct. 854, 43 L. Ed. 2d 54] (1975)." *United States* v. *Watson,* 423 U.S. 411, 417, 96 S. Ct. 820, 46 L. Ed. 2d 598. Here, the defendant was already in custody and had been alerted to his rights. Moreover, his attorney arrived prior to the lineup. No prejudice appears to have resulted from the fact that no warrant was issued until after the lineup.

## II

The defendant next asserts that the police identification procedures violated his rights under the due process clause of the fourteenth amendment to the United States constitution. The standard

established by the United States Supreme Court for determining whether an out-of-court identification procedure gives rise to a due process violation is whether, upon "the totality of the circumstances," the procedure was impermissibly or "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall* v. *Denno,* 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199; see *Neil* v. *Biggers,* 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401; *State* v. *Hafner,* 168 Conn. 230, 235, 362 A.2d 925.

The defendant claims that the circumstances under which Jarvis viewed the defendant outside police headquarters were impermissibly suggestive. It is argued that the fact that Villafane held a general resemblance, in terms of height, complexion, and ethnic background to the gunman seen by Jarvis at Bud's Bar & Grill, when considered with the fact that Villafane was in handcuffs and in the custody of two officers whom Jarvis knew were investigating the shooting, all but compelled Jarvis to conclude that Villafane was the person who had shot Deno. The defendant further argues that after the on-street identification, it was impermissibly suggestive to allow Jarvis to participate in a lineup only a few hours later.

The *Stovall* line of cases makes it clear that the "conduct of a confrontation" may result in a violation of due process of law. *Stovall* v. *Denno,* supra, 302. The Jarvis on-street confrontation was not *conducted* by the police. There was no evidence that the encounter was in any way prearranged: to the contrary, the evidence pointed to the facts that the meeting occurred by chance, and that Jarvis' recognition of the defendant was purely spon-

taneous. Such an encounter does not focus a witness' attention on the accused, and, because of the spontaneous nature of the confrontation, exclusion of subsequent identification testimony would in no way deter questionable police conduct. Cf. *State* v. *Duffen,* 160 Conn. 77, 82, 273 A.2d 863, cert. denied, 402 U.S. 914, 91 S. Ct. 1397, 28 L. Ed. 2d 657. Under the present circumstances, the on-street identification was not wanting in due process. See *United States* v. *Neverson,* 463 F.2d 1224, 1231 (D.C. Cir.). Moreover, we perceive no basis whatsoever for the assertion that the on-street identification in any way tainted the subsequent lineup.

The defendant next claims that the lineup itself was unconstitutionally suggestive. The record reveals that shortly after Jarvis' on-street identification, Officer Connors located the witnesses and brought them to the police station. They were told that they were going to view a lineup, to see if they could make an identification, to take their time, and to be sure of any identification which they might make. The evidence shows that the defendant's attorney was present at all times during the lineup, and that he was given the opportunity to switch the positions of the participants in the lineup and to change their clothing. Photographs of the lineup reveal that all of the lineup participants bore a reasonable resemblance to one another; all appear to have been of the same ethnic background, and all were of a similar weight and height. Two of the participants, of which the defendant was one, had moustaches.

Jarvis was the first to view the lineup, and he quickly identified Villafane. Villafane was then wearing clothes different from the ones he was

wearing on the street. Amaro also identified Villafane quickly. Campolucci took more time, but after two viewings, he identified Villafane as the person who had robbed him. Throughout the entire lineup procedure, the police protected the defendant's constitutional rights. We find the confrontation conducted to have been free from any hint of suggestion.[2]

## III

The defendant has raised three issues with respect to his indictment by the grand jury.

Prior to the convening of the grand jury, the defendant moved to have his attorney present during the grand jury proceedings. The court denied the motion. The defendant claims that the denial of that motion deprived him of his right to have counsel present at a crucial stage of the proceedings as guaranteed by the sixth amendment to the United States constitution, and that it deprived him of his liberty without due process of law in contravention of the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.

---

[2] The defendant has also urged, apparently in an attempt to show that the identifications were unreliable, that the witnesses lacked sufficient opportunity to observe the gunman during the course of the holdup and that there were several discrepancies between the descriptions given by each of the witnesses at the scene of the crime and the actual characteristics of the defendant. In view of the fact that we find no constitutional defects in the identification procedure, we need not determine whether the actual identification was "reliable" in the constitutional sense. Neil v. Biggers, 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401; United States v. Evans, 484 F.2d 1178, 1184–85 (2d Cir.); State v. Hafner, 168 Conn. 230, 240–41, 362 A.2d 925. We note, however, that Campolucci and Jarvis were at the bar when the holdup took place; Amaro was able to observe the gunman from his front door; and the descriptions given by the witnesses at the scene of the crime, while fairly general, did not differ dramatically from the appearance of the defendant.

It is well-settled that an accused has no constitutional right to have counsel present at grand jury proceedings. See, e.g., *Harris* v. *Beto,* 438 F.2d 116 (5th Cir.); *Gollaher* v. *United States,* 419 F.2d 520 (9th Cir.), cert. denied, 396 U.S. 960, 90 S. Ct. 434, 24 L. Ed. 2d 424; *United States* v. *Scully,* 225 F.2d 113 (2d Cir.), cert. denied, 350 U.S. 897, 76 S. Ct. 156, 100 L. Ed. 788; *United States* v. *Levine,* 127 F. Sup. 651 (D.C. Mass.). "It has been unequivocally established in this state that neither precedent nor the due administration of justice requires that counsel be present with the defendant during the grand jury proceedings . . . . *State* v. *Delgado,* 161 Conn. 536, 539, 290 A.2d 338, remanded for resentencing, 408 U.S. 940, 92 S. Ct. 2879, 33 L. Ed. 2d 764; *State* v. *Vennard,* 159 Conn. 385, 390, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625; *State* v. *Stallings,* 154 Conn. 272, 282, 224 A.2d 718." *State* v. *Cobbs,* 164 Conn. 402, 411, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112. The defendant has advanced no compelling reason to depart from that long-standing precedent.

The defendant next claims that the fact that he was not accompanied by a guardian ad litem at the grand jury proceedings rendered those proceedings invalid. The record reveals that Villafane's brother was appointed as his guardian ad litem four days after he was indicted. He argues that § 54-199 of the General Statutes guarantees a juvenile defendant the opportunity to be accompanied by an adult during grand jury proceedings and that the belated appointment here renders the indictment voidable.

We do not agree. Section 54-199 provides in relevant part: "Whenever any minor charged with

the commission of an offense is to appear in any court, he shall be accompanied by one of his parents, if such parent is physically capable of appearing and is within the jurisdiction of such court, or by his legally appointed guardian, if any. . . . The judge of such court may, in his discretion and for good cause, waive the requirement that a minor be accompanied by his parent, guardian or a welfare department representative." By its plain terms, § 54-199 does not require *appointment* of a guardian ad litem, but only that a juvenile defendant be accompanied by a guardian ad litem if he has one. Furthermore, § 54-199 is applicable only when a minor is "to appear in any court." A grand jury is essentially an investigatory body, not a court. See, e.g., *State* v. *Kemp,* 126 Conn. 60, 9 A.2d 63. The fault in the defendant's reasoning becomes apparent when it is realized that the defendant himself had no right to be present at the grand jury proceedings. See, e.g., *State* v. *Menillo,* 159 Conn. 264, 274, 268 A.2d 667. It would therefore be incongruous to hold that he had a right to be accompanied by an adult at the proceedings.

The defendant has also raised the claim that there was a systematic exclusion of persons of Puerto Rican background from the grand jury. That claim was fully considered in *State* v. *Villafane,* 164 Conn. 637, 325 A.2d 251, from which decision we do not depart.

## IV

On February 17, 1972, the defendant filed a motion in the Superior Court requesting that his case be transferred to the Juvenile Court, which motion was denied. The defendant now contends, as he did below, that the then existing statutory

scheme concerning transfers to the Juvenile Court from the "adult" courts established an unconstitutional classification which denied him equal protection of the laws.

Between 1967 and 1971, General Statutes § 54-1a provided in part: "When any complaint has been brought against any person who has attained the age of sixteen years but has not attained the age of eighteen years at the time the offense was committed, the circuit court may transfer such person from its jurisdiction to the jurisdiction of the juvenile court. The juvenile court shall accept jurisdiction of such person when so transferred, except that, where such person has been previously convicted of a crime, or has been previously adjudicated a delinquent, the juvenile court may accept or refuse jurisdiction and, upon acceptance of jurisdiction by the juvenile court, such person shall be considered a child within the meaning of section 17-53." The defendant contends that § 54-1a created a class of individuals, delineated by age, who might be accorded the privilege of being treated as children for purposes of the disposition of criminal charges lodged against them; that no procedure parallel to that established by § 54-1a was available to persons between sixteen and eighteen years of age who found themselves before the Superior Court; that the only distinction between the sixteen- to eighteen-year-old-persons who were before the Superior Court and those before the Circuit Court was the manner in which the jurisdiction of the respective court was acquired, and that that distinction provided no reasonable basis for the difference in treatment. He argues that had he been presented in the Circuit Court, he would have been able to urge that he should have been transferred to the

Juvenile Court where he could have avoided a public trial as well as a lasting criminal record and where the maximum penalties were less severe, but that since he was brought before the Superior Court by virtue of a Superior Court bench warrant, no such opportunity existed, and he was therefore denied equal protection of the laws.

That argument lacks merit. Section 54-1a was repealed and reenacted in 1971, and the reenactment deleted the provisions concerning the power of the Circuit Court to transfer persons to the Juvenile Court. Public Acts 1971, No. 72, § 15; Public Acts 1971, No. 870, § 1. Our examination of Public Acts 1971, No. 870, reveals that it is somewhat unclear whether the Circuit Court's discretionary power to transfer a person to the Juvenile Court ceased as of September 1, 1971, or as of October 1, 1971, but a determination of that question would not affect the present case.[3] The bench warrant by which the Superior Court obtained jurisdiction over the defendant for murder was issued on November 9, 1971. Thus, at the time the Superior Court obtained jurisdiction over this case, the transfer provisions of § 54-1a had been repealed.

---

[3] Public Acts 1971, No. 870, § 131 states: "This act shall take effect September 1, 1971, except that any court before which a case is pending on said date shall retain jurisdiction of such case, provided matters so pending which are transferable from the superior court to the court of common pleas in accordance with the provisions of subsection (b) of section 14 of this act may be so transferred"; however, § 1 of the same act provides in part: "Any complaint or an information based on such complaint concerning any person transferred from the jurisdiction of the circuit court to the jurisdiction of the juvenile court prior to October 1, 1971, shall remain in the circuit court as a confidential record and shall not be disclosed except upon order of a judge of the circuit court," thus implying that the Circuit Court retained the power to transfer juveniles until October 1, 1971.

Moreover, even if the juvenile transfer provisions of § 54-1a had been operative at the time the Superior Court obtained jurisdiction, the defendant's equal protection argument would fail. From a reading of § 54-1a, it is evident that "any complaint" with reference to minors between the ages of sixteen and eighteen years of age referred to any complaint falling within the jurisdiction of the Circuit Court. The Circuit Court did not have jurisdiction to try a murder case; all that court could have done would have been to hold a probable cause hearing. It had no power, therefore, to transfer one accused of murder to the Juvenile Court. There was thus no difference in treatment in the Circuit or Superior Courts with respect to transfer to Juvenile Court of persons charged with murder.

Further, even if the statute had provided the Circuit Court with the discretion to transfer one accused of murder to the Juvenile Court but no such procedure existed in the Superior Court, an equal protection violation would not thereby be established. The decision whether to proceed in the Circuit or Superior Court was for the prosecutor's and the court's discretion. "The exercise of discretion, prosecutorial or judicial, is recognized and accepted within the administrative process of the criminal system. The decision to prosecute, to charge as a second offender, and to sentence, for example, may lay an unequal hand upon persons charged with the same crime. . . . Where an equal protection claim is advanced, as here, an intentional and purposeful discrimination must be shown by one claiming discrimination. *Snowden* v. *Hughes,* 321 U.S. 1, 64 S. Ct. 397, 88 L. Ed. 497; see also *Yick Wo* v. *Hopkins,* 118 U.S. 356, 6 S. Ct. 1064,

30 L. Ed. 220." *State* v. *Townsend,* 167 Conn. 539, 554, 356 A.2d 125. No such showing has here been made.

## V

Upon motion by the defendant made prior to trial, apparently pursuant to § 533D of the Practice Book, the court ordered the state to disclose to the defendant the names of all witnesses which it intended to call at trial.[4] The state complied with that order long before the trial by disclosing a lengthy list of the names and addresses of anticipated witnesses. On April 17, 1974, approximately one week before trial, the defendant filed a "notice of alibi" pursuant to Practice Book § 533G.[5] That notice indicated that the defendant intended to offer evidence that he was at home at the time that the shooting occurred, listed the names of eight witnesses he intended to call in support of the alibi, and stated "[t]hat the

---

[4] "[Practice Book] Sec. 533D. —MATERIALS DISCOVERABLE BY DEFENDANT IN COURT'S DISCRETION: WITNESSES' NAMES Upon motion made by a defendant which shall be as specific as possible under the circumstances, upon a showing of materiality to the preparation of the defense and that the request is reasonable, the court may order the state's attorney or the prosecuting attorney at the time of commencement of trial to disclose to the defendant the name of any person whom the state's attorney or the prosecuting attorney intends to call as a witness in the trial."

[5] "[Practice Book] Sec. 533G. —DISCOVERY BY STATE: ALIBI If the defendant intends to offer as a trial defense that at the time of the commission of the crime charged he was at some place or places other than the scene of the crime, or to call witnesses in support of such defense, he must at the commencement of trial serve upon the state, and file a copy thereof with the court, a 'notice of alibi' reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the name of every such alibi witness upon whom he intends to rely.

If at the trial the defendant calls such an alibi witness without having served the required notice of alibi, or if having served such a notice he calls a witness not specified therein, the court in its discretion may exclude any testimony of such witness relating to the alibi defense."

defendant makes this disclosure solely upon the in court [representations] of the Attorney for the State of Connecticut that he will as soon as possible disclose the name(s) of each witness he intends to offer to dispute the defendant's alibi evidence."

On April 30, 1974, when the trial was in its third day, the state filed a "Supplemental Disclosure" which stated: "Additional witness Emma Reed Noel, 1033 North Avenue, Bridgeport, Connecticut; who will testify concerning certain admissions made to her by the defendant about the shooting at Bud's Bar and Grill during 1971." The state's attorney indicated to the court that the fact of Mrs. Noel's existence came to the state's attention only two days earlier, when the information supplied by the defendant's "notice of alibi" was being investigated. Over objection by the defendant, Emma Noel testified on direct examination that Villafane had admitted to her on several occasions that he had committed the shooting at Bud's Bar & Grill.

The defendant claims that § 533G of the Practice Book is unconstitutional on its face because it fails to provide criminal defendants with discovery rights reciprocal to those provided the state. He contends that Emma Noel's testimony should not have been admitted because the state's knowledge of her existence was obtained solely as a result of the defendant's compliance with that allegedly unconstitutional rule.

In *Wardius* v. *Oregon,* 412 U.S. 470, 472, 93 S. Ct. 2208, 37 L. Ed. 2d 82, the United States Supreme Court held "that the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." In that case, Oregon's "notice of alibi" statute had been enforced by

prohibiting the defendant from introducing alibi evidence because of his failure to comply with the rule. The Oregon rule made no provisions for reciprocal discovery, nor did any Oregon law grant discovery rights to criminal defendants. *Wardius* v. *Oregon,* supra, 471–72, 475. The court, indicating that the due process clause speaks to "the balance of forces between the accused and his accuser," stated (pp. 475–76) : "The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State."

The state of Oregon argued that while its "notice of alibi" rule failed to provide for reciprocal discovery on its face, if the defendant had given notice of his alibi defense, the state courts *might* have read the Oregon statute as requiring reciprocal rights. In rejecting that argument the court stated: "But the State cannot constitutionally force compliance with its scheme on the basis of a totally unsubstantiated possibility that the statute might be read in a manner contrary to its plain language. Thus, in the absence of fair notice that he would have an opportunity to discover the State's rebuttal witnesses, petitioner cannot be compelled to reveal his alibi defense." *Wardius* v. *Oregon,* supra, 478–79.

The language of § 533G of the Practice Book, like the language of the Oregon statute considered in *Wardius,* requires a criminal defendant to divulge the places he claims to have been and the names

of alibi witnesses upon whom he intends to rely, without specifically requiring the state to reciprocate by providing similar information with respect to witnesses whom it intends to call for the purpose of refuting that alibi. Unlike the situation presented in *Wardius,* however, discovery in Connecticut is not a one-way street. Our law provides liberal discovery procedures for criminal defendants, both as a matter of right; see, e.g., Practice Book §§ 533B, 533P; and as matters for the discretion of the court; see Practice Book §§ 533C, 533D. Practice Book § 533D permits the court, in its discretion, to order the prosecuting attorney to disclose to the defendant the names of any persons whom he intends to call as witnesses at the trial, and, to a significant extent, that rule is curative of any facial defects in § 533G. See *Mayer* v. *Moeykens,* 494 F.2d 855, 859 (2d Cir.); *Wright* v. *Superior Court,* 110 Ariz. 265, 517 P.2d 1261; *Reynolds* v. *Superior Court of Los Angeles County,* 117 Cal. Rptr. 437, 528 P.2d 45; *People ex rel. Carey* v. *Strayhorn,* 61 Ill. 2d 85, 329 N.E.2d 194.

As we read *Wardius,* however, a higher degree of predictability than that assured by "the discretion of the court" is necessary to ensure that "the balance of forces between the accused and his accuser" is in harmony with the due process clause of the fourteenth amendment. We therefore hold that if a "notice of alibi" is filed by a defendant pursuant to § 533G, he must be provided with the names of prospective witnesses whose testimony will tend to refute the alibi.

In the present case, the defendant received "fair notice that he would have an opportunity to discover the State's rebuttal witnesses." *Wardius* v. *Oregon,* supra, 479. Prior to the filing of the

"notice of alibi," the state's attorney stipulated that he would "as soon as possible disclose the name(s) of each witness he intends to offer to dispute the defendant's alibi evidence," and, in fact, the "notice of alibi" specifically recited that it was filed on the basis of that assurance. Two days after the witness Noel was discovered, the state disclosed to the defendant her name, her address, and the fact that she would testify to admissions made by the defendant concerning the shooting at Bud's Bar & Grill. It is the defendant's contention that that information was supplied pursuant to the prior court order requiring disclosure of witnesses and was not a counter alibi notice. We consider such a distinction academic. The facts remain that the defendant was alerted to the alibi contest and that the information supplied exceeded in scope that which the state's attorney had agreed to provide.

The defendant also claims that he was denied a fair trial because the state's intention of calling Emma Noel as a witness was not divulged until two days prior to the time that she was called, thus allowing the defendant a relatively short period of time in which to prepare to interrogate the prospective witness. That argument is unpersuasive. The defendant was notified of the state's intention to call Emma Noel as soon as was practicable under the circumstances. If the defendant felt that he had insufficient time to prepare, his remedy would have been to request a continuance, which he did not do.

## VI

During the trial, the defendant offered proof that he was not at the scene of the crime on the morning of April 17, 1971, but was at a party given by his mother and father. Maria Garcia was one of his

alibi witnesses. On direct examination she testified that she had attended a party at the Villafane home on the evening of April 16, 1971; that she remembered the party well; that she arrived at the party at 8 p.m. and left after midnight; and that she saw the defendant at the party. She also stated that one week prior to testifying, she was taken to the police station where she discussed the Villafane case and signed something. On cross-examination, she indicated that there were six or seven young girls at the party; that the defendant's father invited her to the party and picked her up that evening, but that she could not remember the color of the car he was driving; that when she left, she was taken home by a man she met outside on the street; and at the time of giving her testimony she was unaware of the crime with which Maximino Villafane was charged.

She was then asked about the statement she gave at the police station one week earlier. She stated that Officer Serafino Garcia of the Bridgeport housing authority police served as an interpreter for her, that he read the statement to her in Spanish and asked her whether she understood it, and that she did understand it and signed it. She was asked whether she recalled that in the statement given to the police she indicated that it was Mrs. Villafane and not Mr. Villafane who had invited her to the party: she replied that she had said it was both of them. She also indicated that she had told the police that perhaps Mr. Villafane's car was dark, that she had not told the police that the man who had taken her home was at the party, and that she didn't tell the police that she had seen something concerning the defendant's arrest in the Bridgeport Post.

The prosecutor then showed her the statement and asked her if she recognized her signature, which she did. Subsequently, the state called Officer Garcia for the purpose of offering the statement itself into evidence. The defendant objected on the ground that no foundation had been laid for the admission of the statement and because the inconsistencies contained in the statement pertained to collateral matters. The court admitted the statement into evidence and it was read to the jury. With respect to the matters elicited on cross-examination, the statement indicated that she had been invited to the party by Mrs. Villafane, that the car that brought her to the party was dark-colored, that there were seven or eight young girls at the party, that a friend who was at the party and who had arrived after her had taken her home, and that she had read about the shooting in the newspaper.

The defendant now claims, as he did at trial, that the statement should not have been admitted because any inconsistencies between it and Maria Garcia's testimony were collateral to the issues in the case.

"A trial court has wide discretion both as to the allowance of questions involving relevancy and remoteness and as to the scope of cross-examination to show contradictory statements." *State* v. *Keating*, 151 Conn. 592, 597, 200 A.2d 724, cert. denied sub nom. *Joseph* v. *Connecticut*, 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557; see *Covino* v. *Pfeffer*, 160 Conn. 212, 218, 276 A.2d 895. The court, in its discretion, may properly allow cross-examination concerning statements made by a witness prior to testifying in court which are inconsistent with his

in-court testimony, even though the prior statements may be irrelevant to the issues in the case. 3A Wigmore, Evidence (Chadbourn Rev.) § 1023; see, e.g., *Martyn* v. *Donlin,* 151 Conn. 402, 408, 198 A.2d 700; *Vogel* v. *Sylvester,* 148 Conn. 666, 675, 174 A.2d 122. In the interest of promoting judicial economy and of preventing inconvenience and confusion, however, extrinsic evidence of prior inconsistent statements is not generally admitted to contradict a witness' testimony concerning a fact which is collateral or irrelevant to the issues. See 3A Wigmore, supra, § 1020; *State* v. *Crane,* 169 Conn. 242, 245, 362 A.2d 843; *Martyn* v. *Donlin,* supra. Even where admissible, evidence of a prior inconsistent statement of a nonparty witness may not be used to prove the truth of the matter asserted therein, but only to discredit the witness. See 3A Wigmore, supra, § 1018.

A primary consideration in the evaluation of the testimony of any alibi witness is his ability to recall accurately the events of the relevant time period. The witness Garcia testified that she had a good memory of the party of April 16, 1971. Each inconsistency between her statement to the police and her testimony in court concerned events surrounding the party on the date in question. Those inconsistencies could raise a doubt in the minds of the jurors as to her ability to recall any of the events of April 16, and we therefore find no abuse of discretion in the trial court's admission of the statement given to the police.

The defendant also contends that no proper foundation for the introduction of the statement was laid. That claim has little merit. "[I]t has been consistently held in this state that it rests within

the judicial discretion of the trial court whether to admit the impeaching statements where no foundation has been laid." *State* v. *Townsend,* 167 Conn. 539, 560, 356 A.2d 125. Here, a foundation was laid. The state produced the statement, showed it to the witness, and asked her about each inconsistency. The statement was introduced through the testimony of Officer Garcia who related the procedure used in taking the statement and who had translated it to Maria Garcia. There was no error in the manner in which the statement was admitted.

The defendant further argues that the court erred in denying his request to instruct the jury further on the issue of prior inconsistent statements. The court charged that it was for the jury to determine whether the witness' statement to the police was inconsistent with her testimony in court, and if so, whether the credibility of her testimony was thereby affected. The defendant requested that the jury be instructed that when prior inconsistent statements are irrelevant to the issues in the case, they should not be considered. Since the court considered the apparent inconsistencies in her testimony to be relevant, the requested charge would have been factually inappropriate. The charge as given was correct in law and well adapted to the issues of the case.

## VII

Diego Torrens, who in April, 1971, lived in the same house as the Villafane family, was a witness for the state. Torrens testified that the defendant had told him that he had been responsible for the shooting near Bud's Bar & Grill. In the absence of the jury, the state's attorney then requested that he be permitted to examine Torrens concerning

a conversation which Torrens had with the defendant on the day after the shooting in which the defendant invited Torrens to join him in a robbery of a grocery store and in which the defendant stated that he possessed a handgun. The court allowed questioning with regard to the gun, but refused to allow inquiry into the planned robbery. Torrens then testified that on the day after the shooting, the defendant admitted to possession of a handgun. The defendant's counsel did not cross-examine on this point for fear of eliciting testimony concerning the planned robbery.

The defendant claims that Torrens' testimony with respect to the gun should not have been admitted because the defendant's statement concerning the gun was not in the nature of an admission.

To qualify as an admission, a statement made by a party must be inconsistent with a position which he takes at trial. *Johnson* v. *Rockaway Bus Corporation,* 145 Conn. 204, 209, 140 A.2d 708; *Hill* v. *Small,* 129 Conn. 604, 605, 30 A.2d 387. During cross-examination of Officer Cafferty, the defendant brought out the fact that the police had searched the Villafane house for a handgun, but had never found one. That evidence tended to show that the defendant did not have a gun. The statement in issue is clearly contradictory to that proposition and therefore qualified as an admission.

The defendant also claims that the handgun testimony was irrelevant. "Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the

one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. . . . *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639; *Pope Foundation, Inc.* v. *New York, N.H. & H.R. Co.,* 106 Conn. 423, 435, 138 A. 444." *State* v. *Lombardo,* 163 Conn. 241, 243, 304 A.2d 36, quoting from *Federated Department Stores, Inc.* v. *Board of Tax Review,* 162 Conn. 77, 82, 291 A.2d 715. The Federal Rules of Evidence (§ 401) broadly define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evidence indicating that an accused possessed an article with which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime. 1 Wharton, Criminal Evidence (13th Ed.) §§ 157, 211; 22A C.J.S., Criminal Law, § 611; see, e.g., *United States* v. *Leaphart,* 513 F.2d 747, 748 (10th Cir.); *United States* v. *Vosper,* 493 F.2d 433, 435–36 (5th Cir.); *United States* v. *Ravich,* 421 F.2d 1196, 1204 (2d Cir.); *Evans* v. *United States,* 122 F.2d 461 (10th Cir.), cert. denied, 314 U.S. 698, 62 S. Ct. 478, 86 L. Ed. 558; *Commonwealth* v. *Yount,* 455 Pa. 303, 314 A.2d 242; *State* v. *Taylor,* 506 S.W.2d 94 (Mo. App.); cf. *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694. The defendant's alleged admission to the possession of a gun occurred only one day after the shooting. In view of that fact, if the jury believed Torrens' testimony they reasonably could have inferred that the

defendant possessed a gun one day earlier. See, e.g., *United States* v. *Ravich,* supra; see also 2 Wigmore, Evidence (3d Ed.) § 437 (1). Since direct evidence of possession of a handgun at the time of the shooting would have been relevant to show that the defendant possessed the means to commit the crime charged, circumstantial evidence of such possession was also relevant. *United States* v. *Ravich,* supra; cf. *State* v. *Englehart,* 158 Conn. 117, 119, 256 A.2d 231.

The defendant also urges that the admission of Torrens' testimony concerning the handgun had the effect of preventing meaningful cross-examination of Torrens, because any cross-examination in that area would have invited testimony concerning the planned robbery. This claim has no merit. The defendant was not legally precluded from cross-examining Torrens. "[T]he decision whether to cross-examine a witness is almost always a . . . tactical one." *State* v. *Clark,* 170 Conn. 273, 286, 365 A.2d 1167. When a party chooses not to cross-examine a witness in order to avoid the possibility of eliciting harmful testimony, his right to confront and cross-examine that witness as guaranteed by the sixth and fourteenth amendments of the United States constitution is in no way abridged.

There is no error.

In this opinion the other judges concurred.