[Crim. No. 4611.   Third Dist.   May 9, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. THEOPLIS WHEELWRIGHT, Defendant and Appellant.

Paul Petrozzi, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Daniel J. Kremer, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.— Defendant, convicted of forgery, was granted probation. He appeals from the order granting probation. ■ The order is appealable. (Pen. Code, § 1237.)
The only contention possessing merit is that the trial court of its own motion gave the following unexplained and undefined instruction: "Evidence of an oral admission or statement by the defendant ought to be viewed *by* [*sic*] caution."[1] In the context of the facts of this case we hold that the giving of the instruction was error. But we will also hold there was no miscarriage of justice. (Cal. Const., art. VI, § 13.)
James Coleman was the manager of Compton's Market at 3750 Stockton Boulevard in Sacramento. On February 16, 1965, at the opening of the store at 9 a.m., a Negro, later iden-

---

[1]Since from the clerk's transcript it would appear that this instruction is based upon CALJIC 29-D re-revised which uses "*with* caution," it is possible the word "by" is a transcriber's error. In the view of this court the effect upon the jury would have been the same whichever preposition was used.

tified by Coleman as defendant, presented a check to be cashed. He and Coleman were the only ones in the market at the time. The check was ''personalized'' with ''Krishna's International Colonial Theatre, 3522 Stockton Boulevard, Sacramento, California,'' printed on it plus the usual printed computer-data in common use. The date, ''Feb. 16, 1965,'' the name of the payee, ''T. Wheelwright,'' and in words and figures the amount of the check, $135, were handwritten. It bore a printed number ''622.'' It was drawn on the Oak Park Branch of the Bank of America. The check was signed and countersigned. Gourdine H. Battiste and M. Vengetachallian were the apparent signers.

Coleman said he did not know the person presenting the check but was not positive whether or not he had seen him in the market before. He was positive he had never before cashed a check for him or for anyone else identified with the theatre.

He did know, however, the location of the theatre (near the market) and did not think that people working there would receive a weekly pay check of $135. Therefore he questioned the man about the size of the check. Coleman was told that he, the check passer, was the janitor at the theatre and that the sum of the check represented two weeks' pay. Coleman also asked for identification and was shown a driver's license. He then asked the man to indorse the check and write his address beneath his signature. The man did so in Coleman's presence. Coleman compared the signature and the address with similar data on the driver's license (but did not write the license number upon the check). He then cashed the check.

The bank returned the check a few days later marked ''signature irregular.'' The check passer could not be located at the address stated on the check. Coleman notified the police. At police headquarters he was shown a photograph of defendant which Coleman identified as being of the person who had cashed the check.

Defendant had not been employed by the theatre at any time in 1965. He had been employed there, however, for a few months in the fall of 1964 as a janitor. While there he was known as William Wheelwright. Defendant had been discharged during the latter part of November.

Defendant was not apprehended until 1967. The trial was in May of that year. Evidence produced by the prosecution included (in addition to that set forth above) the following: Fred Wilson, an accountant, kept the books of the theatre and issued all payroll checks. He was shown the check that

had been cashed at the market. It was a forgery. M. Vengetachallian was the owner of the theatre; Gourdine H. Battiste was its manager. Battiste's signature was genuine but the owner's signature had been forged. Wilson, corroborated by Battiste, explained the existence of the latter's signature on the check. On checks issued by the theatre two signatures were required. Battiste, Wilson and Vengetachallian were all authorized to sign checks. Sometimes a necessity would arise for the issuance of a check during the absence of Battiste or of Wilson. It was the practice of each to sign a check in blank so that the other by countersigning could complete and issue the check in an emergency. Such checks were left in the checkbook. Checks numbers 621 and 622, the forged check, were so handled. Check number 621 had been signed by Wilson, number 622 by Battiste. Neither check had ever been completed or issued.

The checkbook was placed for safekeeping between magazines in a cabinet of the candy counter of the concessions stand located in the foyer of the theatre. On or about February 16, 1965,[2] when Battiste had arrived at the theatre, he noticed that the bar had been removed from the back door of the theatre and that the door was partly opened. The front door had been locked when Battiste arrived, and there was no evidence of a forced entry. Nothing appeared to be missing. On Friday, February 19, however, accountant Wilson discovered that checks numbered 621 and 622 were missing from the checkbook. The bank was notified to stop payment. Discovery was then made that check number 622 had been sent in by the market for deposit.[3]

During his tenure as janitor defendant had had a key to the front door of the theatre. He had surrendered this to Battiste when he was discharged. He had had no key to the cabinet where the checkbook was kept. That cabinet was equipped with a small latch-type lock and was usually kept locked. However, even when locked, it could be easily manipulated without much effort so as to open the sliding doors of the cabinet.

---

[2]Battiste thought this was a Thursday. Either he was mistaken (since February 16, 1965 fell on a Tuesday) or Coleman was mistaken as to the date when the check was cashed. The check bears the date February 16, 1965. The bank's stamp on the check bears the date February 18, 1965.

[3]There is no evidence of any use of check number 621. It came to light at the trial however under the somewhat peculiar circumstances to be described hereinafter.

Wilson produced the four paychecks which had been issued to defendant while the latter had been the theatre's janitor. Each had been indorsed, "William Wheelwright," and underneath all except one was written the same address: "4036 14 Ave." All had been cashed. The last of the checks, dated November 25, 1964, had been cashed at Compton's Market.

John Jorgensen, a handwriting expert with the Bureau of Criminal Investigation and Identification was a prosecution witness. He testified positively that the indorsement-writings on the forged check and on the four checks actually issued to defendant were written by the same person. A check, number 621 (see fn. 3) which was referred to during the redirect examination of Jorgensen, was shown to the witness, and was admitted into evidence. (Although the record shows this check as admitted into evidence, it was, according to the legend in the transcript, "marked People's Exhibit No. 7 for identification." It is not before us.) During cross-examination Jorgensen had testified that he could not state positively "yes or no" regarding exemplars of defendant's handwriting taken by the police in relation to the indorsements on the forged check and the four other pay checks. Those exemplars had been obtained after defendant's arrest. On redirect examination of Jorgensen, however, it was brought out that at some time before the trial an investigator of the public defender's office had shown him the forged check number 622, also check number 621, and thirdly slips of paper with T. or Theoplis Wheelwright written on them. Jorgensen stated his opinion that the indorsements on both checks and the names on the slips of paper were all written by the same person.

The defense was an alibi. Defendant said he had been in Reno during, for several weeks before, and for several weeks after, the week of February 15-22, 1965. No corroboration was offered of this alibi.

Defendant denied ever having possessed or cashed the forged check. He said that around Christmas 1964 he had lost his driver's license at, he thought, a Napa Valley vineyard. On cross-examination he admitted having been arrested on January 5, 1965, for a failure to appear on earlier traffic violations. There is no evidence of any inquiry regarding the lost driver's license at that time. Later in January, he said, he had written in for a duplicate license. None was issued. The written request was not produced.

Defendant corroborated the prosecution witnesses as to the fact of his employment, that he had received and cashed the

four genuine checks, that he had possession of a key to the front door of the theatre, his surrender of that key, and of the termination of his employment in late November.

## THE CAUTIONARY INSTRUCTION ON ORAL ADMISSIONS

■ Admissibility into evidence of an admission by a party is an exception to the hearsay rule. In legal contemplation an admission is an extrajudicial statement by a party—in a criminal case, by the defendant. It is an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction and which only tends toward the ultimate proof of guilt. (*People* v. *Fitzgerald* (1961) 56 Cal.2d 855, 861 [17 Cal.Rptr. 129, 366 P.2d 481]; *In re Cline* (1967) 255 Cal. App.2d 115, 122 [63 Cal.Rptr. 233]; *People* v. *Beverly,* 233 Cal.App.2d 702, 712 [43 Cal.Rptr. 743], hear. den.; Evid. Code, § 1220.) The theory of the admissibility of an admission is that the policy of the hearsay-exclusionary rule cannot reasonably be invoked by a party who is himself present and can testify in explanation or contradiction of the prior statement or conduct and can cross-examine the witness who testifies to the party's statement. (See Evid. Code, § 1220, Comment.)

■ It is of course error to give any instruction as to the weight of an admission when in fact there has been no testimony regarding an admission. The giving of such an instruction may or may not constitute reversible error. (*People* v. *Ramsey* (1962) 202 Cal.App.2d 856, 860 [21 Cal.Rptr. 406].)

The only evidence in this case that could possibly be stated to fall within the definition of an ''admission'' is the statement by the check passer to Coleman that he was (inferably at the time of presenting the check) a janitor at the theatre. If the jury believed Coleman's identification, then that person was the defendant. Strictly speaking, the statement was an admission since the undisputed fact that defendant had formerly been the theatre's janitor and the fact that the check passer had claimed to be the janitor at the time of the check passing may be said to have some connection and therefore some relevance tending toward the ultimate proof of guilt. It is obvious, however that this is not the usual sort of admission, denied or undenied, with the admissibility of which the courts have had to deal in criminal prosecutions.

■ The cautionary instruction which the court gave regarding ''admissions or statements'' stems from Code of Civil

Procedure section 2061, subdivision 4,[4] which required the court to instruct the jury to view "evidence of the oral admissions of a party with caution." It is an instruction intended to protect the defendant since it has been held that "No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury . . . ." (*People* v. *Bemis* (1949) 33 Cal.2d 395, 399 [202 P.2d 82].) In a proper case it has been held to be reversible error not to give the instruction. (*People* v. *Ford* (1964) 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 388 P.2d 892].) But the giving of the instruction was not intended to backfire. ■■■ Here the court merely instructed the jury: "Evidence of an oral admission or statement by the defendant ought to be viewed with [or 'by] caution." That was stated without any definition or explanation of the terms used. We had some difficulty recognizing, and we are sure the jury would have had greater difficulty recognizing, the assumed statement by the assumed defendant as being an admission at all. The Attorney General argues that any layman would not only know that it was but would understand what was meant by the instruction without any definition or expanation of terms. We do not agree. Lawyers know that "evidence of an oral admission, etc." refers to evidence given by another witness. A jury would not necessarily know that. Lawyers know that in legal contemplation the "oral admission or statement by the defendant" usually refers to an extrajudicial statement. Lay jurors, uninstructed, cannot reasonably be expected to distinguish between an extrajudicial statement and testimony. Here defendant had testified. To view "with caution" is effectually to view with suspicion. Had the judge told the jury that the law of California admonished it to view with caution the testimony of a witness which purported to relate an oral admission of the defendant, it would at least have made it clear that it was not being instructed to view the defendant's testimony with suspicion. As the instruction was framed it was susceptible to the latter interpretation.

Moreover in this unexplained instruction, the judge was coming close to making a pronouncement—that an admission or statement had, in fact, been made by defendant.[5] Such a

---

[4]Section 2061, subdivision 4, was repealed when the Evidence Code was adopted and no specific Evidence Code section replaces it. The Law Revision Commission comment states that the former section was repealed "to avoid singling out only a few of the cautionary instructions that are given by the courts."

[5]We are not unmindful that elsewhere the court had given the standard

pronouncement would be to tell the jury that defendant was the check passer and therefore guilty. The giving of the instruction without clarifying explanation was error.

### THE QUESTION AS TO MISCARRIAGE OF JUSTICE

■ It has been held that the failure to give a cautionary instruction is not necessarily reversible error. Cases so holding are reviewed exhaustively in *People* v. *Sutton* (1964) 224 Cal. App.2d 708, at page 712 [37 Cal.Rptr. 23] et seq. The improper giving of an instruction which actually *does not caution* should be tested by the same rules. The test (as applied to this type of case) is still that of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], where the court at page 835 states: "Emphasis in the main . . . has been placed on the constitutional requirements of a fair trial and due process . . . ." The court also says on page 836: "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." The *Watson* case adds (on p. 837): "[T]he test . . . must necessarily be based upon reasonable probabilities rather than mere possibilities; otherwise the entire purpose of the constitutional provision [i.e., art. VI, § 13] would be defeated."

■ It must be obvious that when we have found error and test the question of reversibility under the principles just stated we no longer apply the "substantial evidence rule" as a basis to uphold the verdict. A reweighing of all the evidence is our inevitable obligation. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836; *Aldabe* v. *Aldabe,* 209 Cal.App.2d 453, 457 [26 Cal. Rptr. 208]; 3 Witkin, Cal. Procedure (1954) Appeal § 100, p. 2269.) ■ Fulfilling that obligation, we have considered evidence which might be said to favor the defense. There was the uncertainty of handwriting expert Jorgensen's testimony re-

---

instructions that the jury was the sole and exclusive judge of the facts; also that the applicability of some of the instructions would depend upon the conclusions reached by the jury as to what the facts are, and that the jury was to disregard an instruction applicable only to facts found not to exist. Those instructions, however, are not necessarily a cure-all. It is well settled that instructions which assume the existence of a fact with respect to which there is a conflict of evidence are erroneously given (48 Cal.Jur.2d, Trial, § 193, p. 221) and the error is not cured by other instructions which submit all questions of fact to the jury. (*Bragg* v. *Mobilhome Co.* (1956) 145 Cal.App.2d 326, 335 [302 P.2d 424], hear. den.)

garding the exemplars of handwriting furnished by defendant to the police. (We have noted, however, that they were taken with knowledge by defendant of the purpose for which they would be used and under circumstances where an effort by defendant to disguise his handwriting would be understandable.) We have considered certain inconsistencies in Coleman's testimony. These were inconsistencies, however, not necessary to enumerate, in instances where descriptive evidence given by eyewitnesses is rarely exact. There was the statement by Coleman that he had never cashed a check for defendant other than the forged check. The last genuine check cashed by defendant had been cashed at Compton's Market. (There was no evidence adduced establishing that Coleman had cashed it.) We have considered that manager Battiste had seen defendant at least twice after the forgery of the check had been discovered and had not questioned him about it. We may wonder at this; its significance to cast doubt on defendant's guilt escapes us. Had Battiste remembered that the last name ''Wheelwright'' admittedly appeared as the payee and endorser of the check and that ''Wheelwright'' was also the name of the short-time-employed theatre janitor, he would certainly have questioned defendant. The fact that he did not establishes only a faulty memory.

We do not believe that a jury could have considered any of these matters significant. Against the positive handwriting evidence, the positive identification, and other convincing circumstantial evidence, we inevitably reach the conclusion that there is no reasonable probability that a reasonable jury could have failed to find defendant guilty.

The order is affirmed.

Friedman, J., and Regan, J., concurred.