STATE OF CONNECTICUT *v.* WILLIAM H. STEPNEY, JR. (10574)

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and SHEA, JS.

234

Argued May 11—decision released August 30, 1983

*James A. Wade,* with whom was *Sally S. King,* for the appellant (defendant).

*Carl J. Schuman,* assistant state's attorney, with whom was *Anne C. Dranginis,* assistant state's attorney, and, on the brief, *Dennis A. Santore,* state's attorney, for the appellee (state).

Speziale, C. J. The defendant, William H. Stepney, Jr., was indicted by a grand jury for the crime of murder in violation of General Statutes § 53a-54a.[1] A trial before a jury of twelve commenced in October of 1980. Just prior to trial, the defendant filed a motion to suppress evidence which was denied by the trial court. Following fifteen days of testimony and deliberation for two days, the jury returned a verdict of guilty. From the judgment rendered on that verdict the defendant has appealed to this court.

On appeal the defendant claims that the trial court erred in: (1) the denial of his motion to suppress evidence seized pursuant to an allegedly invalid warrant; (2) the denial of his motion for a second bill of particulars; (3) the exclusion from evidence of certain items of clothing upon which his expert had conducted out-of-court tests; (4) the charge to the jury concerning the credibility of witnesses; (5) the admission of testimony by police officers concerning hearsay declarations by the defendant; and (6) the denial of his motion for judgment of acquittal based on the insufficiency of the evidence. We find no error.

The jury reasonably could have found the following facts: On May 9, 1979, at approximately 3:45 p.m., the body of Mrs. Barbara McKitis was discovered in the bedroom of her home in Bantam. The victim had been severely beaten with a blunt object, possibly a blood-stained brick found near the body. There were five "chop" wounds on her skull, consistent with the use of an axe or hatchet. Multiple stab wounds and slash wounds were found on her head, neck, and legs. One

[1] Following the indictment, but before trial, the trial court reserved to this court the question of whether the charge on intent to the grand jury complied with due process. We found the charge to be without error in *State v. Stepney,* 181 Conn. 268, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981).

of the stab wounds in her neck had severed the vertebral artery. There was a penetration wound to the victim's genitalia, which had been made before death.

The body was lying on its left side on the floor of the bedroom near the bed. The victim's dungarees were pulled down around the ankles and her panties were around her knees. Blood was spattered on the bed, the carpet, the walls, and on other objects throughout the bedroom, which was in extreme disarray. A butcher knife was found under the body and an eight ounce Budweiser beer can was lying approximately eighteen inches away. The medical examiner estimated that death had occurred "closer to the morning hours than to the afternoon."

The defendant had met the victim on May 3, 1979, six days before the murder, in connection with an ongoing tag sale of furniture and household goods she was holding following a separation from her husband. The defendant returned to the victim's house with his wife and daughter on May 5 and May 7 to buy a few items. He also arranged to help her clear some scrap metal out of her garage to sell to a junk dealer. On May 8, the defendant spent most of the day at the victim's house, during which time he filled his truck with scrap metal. He drove the fully loaded truck to his home in Morris that evening. Early the next day, the day of the murder, the defendant drove the truckload of scrap metal to a junkyard in Waterbury, returning home between 9:30 and 10 a.m. When the defendant told his wife that he was going to the victim's house to split the money from the sale of the scrap with her and to pick up another load, Mrs. Stepney became annoyed and a quarrel ensued. The defendant left home in his truck some time after 10 a.m. Between 10 and 10:30 a.m. he bought an eight pack of eight ounce Budweiser beer in Morris, and between 10 and 11 a.m. he bought

another eight pack in Bantam. His truck was seen parked in the victim's backyard sometime between 10:30 and 11 a.m. The defendant's truck left the victim's house between 11:15 and 11:30 a.m. and arrived at the defendant's house between 11:45 a.m. and noon.

The defendant's own testimony was that he arrived in his truck at the victim's house on May 9, the day of the murder, at about 10:45 a.m. He drank one of the eight ounce cans of beer and gave another to the victim. He stated that he and the victim talked together for thirty minutes or so, and that he mixed the victim a highball during that time. He arrived back at his own home at about noon.

The victim's blood was type AB, Rh negative. The defendant's blood was type B, Rh positive. Bloodstains which tested as AB negative were discovered on the inside of a pair of green workpants seized from the defendant, on the sole of a canvas shoe belonging to the defendant, and on the steering wheel of the defendant's truck.

## I

### THE SEARCH WARRANT AFFIDAVIT

The defendant's first claim is that the trial court erred when it denied his motion to suppress certain items of evidence seized from the defendant pursuant to a search warrant. He asserts that the search warrant for these items was based upon an affidavit that contained deliberate false statements which if removed would render the affidavit insufficient to establish probable cause for a search warrant to issue. We disagree.

In *Franks* v. *Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), the United States Supreme Court held that "where the defendant makes

a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." Although the court in *Franks* mentioned only "false statements . . . included . . . in the warrant affidavit," material omissions from such an affidavit also fall within the rule if the defendant proves that the omissions were knowingly and intentionally made, or were made with reckless disregard for the accuracy of the affidavit. *United States* v. *Martin,* 615 F.2d 318, 328 (5th Cir. 1980).

In this case, the defendant's challenge to the accuracy of the search warrant affidavit was made as part of a motion to suppress which also included several other claims not relevant to this appeal. The defendant claims that information presented in two paragraphs of the search warrant affidavit of Troopers James M. Cavanaugh and James Daloisio contained deliberate falsehoods concerning statements made by the defendant at two interviews conducted on May 9, one at the defendant's home at 5:30 p.m. and another at the police barracks at 8:30 p.m. The defendant's brief is vague about precisely what statements or omissions he considers to have been false. The only clear assertion is that a paragraph, relating to the first interview, con-

tains the defendant's statement that he arrived home from the victim's house at 10:30 to 10:45 a.m., whereas that statement was made only during the second interview. Daloisio admitted at the hearing on the motion to suppress[2] that the statement was not made at the 5:30 p.m. interview, but rather at the 8:30 p.m. interview. It is not enough, however, for the defendant to show an error in an affidavit. The error must be shown by a preponderance of the evidence to have been "knowingly and intentionally" false or made "with reckless disregard for the truth." *Franks* v. *Delaware,* supra, 155. "Allegations of negligence or innocent mistake are insufficient" to require a reevaluation of the affidavit. Id., 171. The trial court in this case found that "[t]here was no showing of any intent on the part of Daloisio to intentionally mislead the judge, or that he acted with reckless disregard for the truth." We may reject this finding only if it is clearly erroneous. Practice Book § 3060D. Nothing before us indicates that the finding is "unsupported by the record, incorrect or otherwise mistaken"; *Kaplan* v. *Kaplan,* 186 Conn. 387, 391, 441 A.2d 629 (1982); and we cannot find it to be clearly erroneous.[3] In view of this specific finding, the trial court correctly denied the motion to suppress.

[2] The state objected to the taking of any testimony concerning alleged false statements or omissions unless the trial court first made a determination that the defendant had made "a substantial preliminary showing" as required by *Franks* v. *Delaware,* 438 U.S. 154, 155, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Without specifically making such a finding the court proceeded with a hearing on the motion to suppress. Although it is the better practice for the trial court to make a specific finding that the requisite preliminary showing has been made by the defendant, in this case the court implicitly found that the showing had been made, because it proceeded to address the merits of the defendant's claim.

[3] Although the defendant, his wife, and his daughter all testified at the suppression hearing that the defendant told Daloisio that he arrived home at about noon on May 9, the defendant does not press a claim that Daloisio lied about the content of the statements made by the defendant. Such an argument would be futile, because the court, which was the sole judge of

## II

### BILL OF PARTICULARS

The defendant's next claim is that the trial court, *N. O'Neill, J.,* erred by denying his pretrial motion for a further bill of particulars after the state had filed one bill of particulars. The true bill returned by the grand jury on August 16, 1979, charged that the defendant murdered the victim on May 9, 1979. On August 23, 1979, the defendant filed a motion for a bill of particulars as to the time of the offense and the place of the offense. On September 19, 1979, the state filed its bill of particulars, stating that the crime was committed on "May 9, 1979 between the hours of 9:00 a.m. and 3:56 p.m." at the victim's home. On October 2, 1979, the defendant filed a motion for a further bill of particulars seeking to have the time of day of the offense made more specific. The trial court denied the motion.

"The accused in a criminal proceeding has a right to be informed of the nature and cause of the accusation. U.S. Const. amend. VI; Conn. Const. art. I § 8. The offense should be described with sufficient definiteness and particularity to apprise the accused of the nature of the charge so he can prepare to meet it at his trial. 2 Wharton, Criminal Procedure § 258 (12th Ed. 1975). The function of the bill of particulars under Connecticut practice is to enable the defendant to obtain a more precise statement of the offense charged in the information in order to prepare a defense." *State* v. *Troynack,* 174 Conn. 89, 96, 384 A.2d 326 (1977). Practice Book § 832 requires "that a bill of particulars

---

credibility in this situation, rejected this testimony and chose to believe the testimony of Troopers Daloisio and Cavanaugh that the defendant stated that he "got home from the victim's house between 10:30 and 10:45 a.m. and remained home the rest of the day."

disclose information sufficient to enable the defendant to prepare his defense, including but being not limited to reasonable notice of the crime charged and the date, time, and place of its commission."

" 'A motion for a bill of particulars is addressed to the sound discretion of the trial court. *United States* v. *Gray,* 464 F.2d 632, 635 (8th Cir. [1972]); *Wong Tai* v. *United States,* 273 U.S. 77, 80–81, 47 S. Ct. 300, 71 L. Ed. 545 [1927]; *State* v. *Beaulieu,* 164 Conn. 620, 624, 325 A.2d 263 [1973]; *State* v. *DiBella,* 157 Conn. 330, 339, 254 A.2d 477 [1968]. . . . [A]n abuse of discretion in the denial of a motion for a bill of particulars can be premised only upon a clear and specific showing of prejudice to the defense; *State* v. *Curtis* . . . [146 Conn. 365, 368, 151 A.2d 336 (1959)]; see *United States* v. *Addonizio,* 451 F.2d 49, 64 (3d Cir.) [cert. denied, 405 U.S. 936, 92 S. Ct. 949, 30 L. Ed. 2d 812, reh. denied, 405 U.S. 1048, 92 S. Ct. 1309, 31 L. Ed. 2d 591 (1972)].' *State* v. *Hauck,* 172 Conn. 140, 151, 374 A.2d 150 [1976]. The defendant has the burden of showing why the additional particulars were necessary to the preparation of his defense. *State* v. *DiBella,* 157 Conn. 330, 339, 254 A.2d 477 [1968]; *State* v. *Curtis,* 146 Conn. 365, 367, 151 A.2d 336 [1959]." *State* v. *Brown,* 173 Conn. 254, 257, 377 A.2d 268 (1977).

The gravamen of the defendant's complaint on appeal is that because he offered an alibi defense,[4] the seven hour time frame stated in the bill of particulars forced

---

[4] That a defendant may offer an alibi defense is a factor to be considered by the court in deciding whether to grant a motion under Practice Book § 832, but an alibi defense does not create a per se requirement that the state limit the times in the information more narrowly than the evidence available warrants Whether the evidence available to the state has shown beyond a reasonable doubt that the defendant was at the scene of the crime at a time when it could have been committed is an issue for the jury to determine.

him to bear "the burden of accounting for his whereabouts at other times not relevant to the state's claim" that the defendant was the murderer and that "the examination of witnesses would have been more properly confined to a relevant time frame had the state alleged the time of the crime with more particularity."

The state has a duty to inform a defendant, within reasonable limits, of the time when the offense charged was alleged to have been committed. The state does not have a duty, however, to disclose information which the state does not have. Neither the sixth amendment of the United States constitution nor article first, § 8 of the Connecticut constitution requires that the state choose a particular moment as the time of an offense when the best information available to the state is imprecise. If the state had known to a reasonable certainty that the murder was committed within a narrower time frame than that provided in the bill of particulars, then the defendant's claim of error would be more convincing. But the state was not able to determine the time of death more precisely than the medical examiner's testimony that it was "closer to the morning hours than to the afternoon."

Furthermore, the defendant does not allege that he was unable to prepare or to present his defense of alibi properly, but only that it was more burdensome and difficult to do so. Even if the state had been able to narrow the time frame, burdens of the kind alleged by the defendant are not of sufficient magnitude to prejudice his ability to present an adequate defense. Under these circumstances, the trial court, *N. O'Neill, J.,* did not err in denying the motion for a further bill of particulars.

## III

### EXCLUSION OF EVIDENCE OF BLOOD-STAINED CLOTHING

The defendant's next claim is that the trial court erred when it refused to permit him to introduce through an expert witness evidence relating to blood stains on two pairs of trousers allegedly belonging to the defendant. The state's exhibit 1 was a pair of trousers belonging to the defendant which had a pattern of contact bloodstains,[5] testing as type AB, Rh negative, on the inside of the legs between the crotch and knee. The victim's blood type was AB, Rh negative, while the defendant's was B, Rh positive.

The defendant's expert theorized that the bloodstains could be from the defendant's own blood that had stained the trousers after he had scratched poison ivy sores on his legs. The defendant testified that he had such open sores on his legs at the time of the murder and that he had been treating them with a calamine-type lotion.[6] The defendant's expert serologist testified that when blood of group B, the defendant's type, was mixed with calamine, dried, and then reconstituted for testing, it could test falsely as group AB, the victim's blood type. The expert had not attempted to discover whether the calamine also could affect testing of Rh factors, and the state did not present any evidence on the point.

---

[5] A contact bloodstain is one where a spot of blood is absorbed after contact with clothing, as opposed to a splattered bloodstain which produces a discernibly different pattern.

[6] Both the defendant and Mrs. Stepney testified that he had poison ivy all over his body. The police observed poison ivy sores only on the defendant's arms on the day of the murder. Mrs. Stepney failed to mention that the defendant had any sores on his legs in her testimony at a pretrial motion to suppress.

The defendant tried to introduce two pairs of trousers that also had contact bloodstains on the insides of the legs. These trousers allegedly had been found along with several other items by the defendant's wife in a "rag bag" in the basement of the defendant's home on the second day of trial. Mrs. Stepney could not say whether any of the items had been laundered before being placed in the bag. She testified that some items might have been lying around for more than two years, that is, many months earlier than the date of the crime. She could not say whether the trousers had been worn by the defendant at or near the date of the crime. The stains were only of type B blood, and no traces of calamine lotion could be detected on the trousers.

The state objected to the offer of the trousers or of testimony concerning tests conducted on them, claiming that the evidence was irrelevant because no proper foundation had been laid connecting the trousers to the time of the incident. The trial court agreed and refused to admit the trousers or the testimony.[7] The defendant then made an offer of proof that the trousers were stained in a pattern similar to the pattern on the state's exhibit 1 and that because the stains were of a similar pattern and type, "the jury could consider whether or not [the defendant] had other problems with the same type of poison ivy problem on the inside of his pants . . . ." The court again sustained the state's objection.

[7] The state's objection and the court's ruling were as follows:

"Ms. Dranginis [Assistant State's Attorney]: Your Honor, I'm going to object to the offer on the basis essentially of relevance insofar as these items being tested. There has been testimony by Mrs. Stepney that she doesn't really know when they were worn in conjunction with this incident. She doesn't know how many times they were worn by Mr. Stepney, when they were worn, when they were washed. They were admittedly left in a ragbag with all sorts of other things that could have been contaminated, without any kind of protection for up to two years in the basement of their house, and I don't know what significance any tests could have on those, nor do I feel it would be proper in terms of protection of those items to have any results of any tests on those items put before this jury. I don't think that

"When determining if the object should be admitted, the trial court should consider the nature of the article, the circumstances surrounding the preservation and custody of it, and the possibility of intermeddlers tampering with it." *People* v. *Prast,* 319 N.W.2d 627, 636 (Mich. App. 1982); see also *State* v. *Alford,* 384 So. 2d 761, 765 (La. 1980); *Washburn* v. *State,* 318 S.W.2d 627, 635–36 (Tex. Crim. App. 1958). The trial court in the present case refused to admit the trousers because "[w]e can't tell . . . how long they had been where they were found, what has happened to them, what might have stained them. All of those factors are unknown . . . ." The defendant claimed that the trousers were relevant to show the possibility that the defendant might have had poison ivy on his legs at some other time. If the defendant could have established when he wore the pants and that he had been afflicted with poison ivy at that time, the proffered evidence might have been marginally relevant to show that it was possible that the stains on the state's exhibit 1 were from bleeding poison ivy. The state, however, never contested that such stains were a theoretical possibility; it claimed rather that they were not actually made in that way. The trial court reasonably could have concluded that the foundation laid for admission of the trousers was insufficient to support even the inference

---

the integrity of those items has been sufficiently kept so that they can become items from which test results can be demonstrated to this jury.

"Mr. Wade [Defense Counsel]: I claim the relevance. I think she is talking about the weight that should be accorded.

"Ms. Dranginis: Your Honor, I think before anything goes to the jury, there are certain standards that have to be met. We went through a lot of that in terms of the evidence in this case, and nothing is sitting around for two years in a basement mixed with a lot of other stuff.

"The Court: Well, it seems to me at this point that is a problem that is difficult to overcome. We can't tell, first of all, how long they had been where they were found, what has happened to them, what might have stained them. All of those factors are unknown, so, unless they—unless it can be established, it seems to me that the objection is sound."

suggested by the defendant. The court was not required to admit evidence that was merely speculative. Under all the circumstances, we cannot say that the trial court abused its discretion when it refused to admit evidence concerning the trousers. See *State* v. *Bennett,* 20 Wash. App. 783, 788, 582 P.2d 569 (1978).

## IV

### JURY CHARGE ON CREDIBILITY

During its charge to the jury on the credibility of witnesses, the trial court, *Stoughton, J.,* stated in part: "It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached. Evidence was offered in this case, as I remember it and, of course, this is for you to recall. Your recollection is controlling.

"I think there was evidence of statements, for example, by Mrs. Stepney which you may believe to have been inconsistent with her testimony. You heard the evidence and you heard her explanation as to some of it, anyway. It is for you to remember the testimony, of course. You may find other examples, and it is for you to determine whether these or any of them are in fact inconsistent and, if they are, the weight you will give them in weighing the credibility of the witness, and that is the sole purpose for which they were admitted. This is the case with any claimed inconsistent statement which was admitted during the trial as to any witness."

The defendant claims that by specifically mentioning only Mrs. Stepney as having been impeached, "the court in effect said that [her] testimony should be subject to special scrutiny and a special set of rules." Although he assigns error to this portion of the court's

charge, the defendant never makes clear the grounds, constitutional or otherwise, upon which error should be found.

"The defendant was entitled to have the jury correctly and adequately instructed. *Mack* v. *Perzanowski,* 172 Conn. 310, 312, 374 A.2d 156 (1977)." *State* v. *Hines,* 187 Conn. 199, 206, 445 A.2d 314 (1982). " 'The test to be applied to any part of a charge is whether the charge considered as a whole presents the case to the jury so that no injustice will result.' *State* v. *Mullings,* 166 Conn. 268, 275, 348 A.2d 645 [1974]; *Siladi* v. *McNamara,* 164 Conn. 510, 515, 325 A.2d 277 [1973]." *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977). " 'It is a well-established rule that the charge to the jury must be read as a whole and that individual instructions are not to be judged in "artificial isolation" from the overall charge. *Cupp* v. *Naughten,* 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 [1973]; *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147 [1974].' *State* v. *Crawford,* 172 Conn. 65, 69, 372 A.2d 154 [1976]." *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977).

"Common sense, and more to the point, fairness, must acknowledge that the use of a proper example in jury instructions serves to make less abstract and more comprehensible the meaning of a complex legal concept or term. The same considerations, however, would indicate that a jury may give undue weight to examples because they are easier to understand and may even simply compare the defendant's actions with the example. 'To prevent these adverse effects, the trial judge must clearly indicate that the examples are *only* examples, and that the jury must determine guilt or

innocence by following the jury instructions as a whole.' (Emphasis in original.) *People* v. *Shepherd,* 63 Mich. App. 316, 322, 234 N.W.2d 502 (1975) . . . . 'In considering whether an illustration is fair or prejudicial, it is necessary to consider the instructions as a whole and all the facts and circumstances surrounding the trial and shown by the evidence, such as the complexity or simplicity of the issues and the multiplicity of facts.' *Luteran* v. *United States,* 93 F.2d 395, 401 (8th Cir. 1937), cert. denied, 303 U.S. 644, 58 S. Ct. 642, 82 L. Ed. 1103 (1938)." *State* v. *Hines,* supra, 210–11.

"On numerous occasions this court has stated that the trial court in a criminal case may, in its discretion, make fair comment on the evidence and particularly on the credibility of witnesses." *State* v. *Cari,* 163 Conn. 174, 182, 303 A.2d 7 (1972), quoted in *State* v. *Bennett,* 172 Conn. 324, 329, 374 A.2d 247 (1977). The trial court's illustrative comment concerning contradictions in Mrs. Stepney's testimony was certainly "fair comment" on her testimony. Her cross-examination revealed numerous contradictions between her trial testimony and prior statements at the suppression hearing or to the police concerning the defendant's actions on the day of the murder. A review of the record convinces us that the court's reference to Mrs. Stepney's testimony did not unduly emphasize the extent of the impeachment, but served as an example to the jury to illuminate the credibility instruction. It was both clearly labeled as an example and surrounded by careful qualifying language. The court repeatedly reminded the jury that they were the sole judges of credibility. It emphasized that the jury's recollections of the testimony governed over any comments the court had made. The court's instructions, read as a whole, were scrupulously

fair and balanced,[8] and the challenged credibility instruction was well within the court's discretion. There was no error in the instructions to the jury.[9]

## V

### ADMISSIBILITY OF THE DEFENDANT'S HEARSAY DECLARATIONS

The state offered in its case in chief testimony by police officers of statements made by the defendant at two interviews conducted on the day of the murder. The court admitted the testimony as admissions by the defendant over the defendant's objection that the statements were inadmissible hearsay. The defendant claims on appeal that the court's action was error. We disagree.

An out-of-court statement that is offered to establish the truth of the matters contained therein is hearsay. *State* v. *Packard,* 184 Conn. 258, 274, 439 A.2d 983 (1981). Though generally inadmissible, hearsay may be admitted if there is a sufficient probability that the statement is reliable and trustworthy, if the evidence contained in the statement is necessary to resolution of the case, and if the trial court concludes that admit-

---

[8] The following portion of the instructions, given just before the jury retired to deliberate, is illustrative of the court's balanced approach throughout its instructions:

"Remember, as I have told you before, that your recollection of the facts is controlling, and that it is your function to determine what those facts were. Remember that the burden of proof is on the State throughout the case. The defense does not have to disprove the case or prove anything. As I have said, if I have referred to testimony of any witnesses, I do not mean to emphasize that over any other testimony in the case. You must remember that you are the sole judges of the facts. If I did make any reference here and there to the testimony, you disregard what I say, if it differs from your recollection, because your recollection is controlling."

[9] The defendant's challenge to the instruction concerning the defendant's interest in the outcome of the trial is "utterly without merit." *State* v. *Roos,* 188 Conn. 644, 645, 452 A.2d 1163 (1982).

ting the statement is in the interests of justice. 5 Wigmore, Evidence (Chadbourn Rev. 1974) § 1422, pp. 253–54. Some types of admissible hearsay occur frequently enough that certain defined exceptions to the general rule of inadmissibility have come to be recognized.

Among the recognized exceptions to the hearsay exclusionary rule is that for admissions of a party. *State* v. *DeMatteo,* 186 Conn. 696, 702, 443 A.2d 915 (1982); Tait & LaPlante, Connecticut Evidence (1976) § 11.5, p. 186; McCormick, Evidence (2d Ed. 1972) § 262, p. 628. The statements in dispute were allowed by the trial court as admissions by the defendant. The defendant claims, however, that "[t]o qualify as an admission, a statement made by a party must be inconsistent with a position which he takes at trial." *State* v. *Villafane,* 171 Conn. 644, 674, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977). The defendant asserts that because the proffered statements by the defendant were exculpatory and therefore consistent with his plea of "not guilty," they were not admissions, and the court erred by admitting them.[10] We disagree.

" 'An admission, as applied to criminal cases, is the avowal or acknowledgment of a fact or of circumstances from which guilt *may* be inferred, and only *tending* to prove the offense charged, but not amounting to a confession of guilt.' *Riley* v. *State,* 1 Ga. App.

[10] This court in *State* v. *Villafane,* 171 Conn. 644, 674, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), found that the defendant's cross-examination of a state's witness revealed the defendant's position at trial, and that the defendant's hearsay statements were contradictory to that position. The trial court in the present case used similar reasoning. Because we hold today that admissions in criminal cases need not be shown to be inconsistent with a position taken at trial, we need not discuss the theory that cross-examination by a defendant alone may reveal a position at trial.

651, 654 (57 SE 1031) (1907). An acknowledgment by the defendant that he was present at or near the scene of the crime, while not a confession, can be found by the jury to be incriminatory in light of other facts. . . . One circumstance which the jury could have properly taken into consideration in determining that the statements made by the appellant were incriminatory was that the statements were contradictory. . . . Statements which are intended to be exculpatory may, nonetheless, be found to be inculpatory. 'Declarations made with an exculpatory object may have an inculpatory effect.' *Fletcher* v. *State*, 90 Ga. 468 (3) (17 SE 100) (1892)." (Citations omitted.) (Emphasis in original.) *Pendergrass* v. *State*, 245 Ga. 626, 627, 266 S.E.2d 225 (1980). "The statements made out of court by a party-opponent are universally deemed admissible when offered against him"; 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048, p. 2; so long as they are relevant and material to issues in the case. Although the theories for admissibility differ,[11] the vast weight of authority, judicial, legislative, and scholarly, supports the admissibility without restriction of any statement of a party offered against that party at trial.[12] At least seventeen states admit evidence of admissions as exceptions to the hearsay exclusionary rule in criminal cases without requiring that they be contrary to the party's position at trial.[13]

---

[11] Compare Morgan, Basic Problems of Evidence (1962) 265, and 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048, pp. 2–5, with Commentary to Federal Rule of Evidence 801 (d) (2), McCormick, Evidence (2d Ed. 1972) § 262, p. 629, and Strahorn, "A Reconsideration of the Hearsay Rule and Admissions," 85 U. Pa. L. Rev. 484, 564 (1937).

[12] See, e.g., 4 Wigmore, Evidence (Chadbourn Rev. 1972) § 1048; McCormick, Evidence (2d Ed. 1972) § 262; Tait & LaPlante, Connecticut Evidence (1976) § 11.5; 3 Wharton, Criminal Evidence (13th Ed. 1973) § 694; 31A C.J.S., Evidence § 270 et seq; Uniform Rules of Evidence 63 (7), 63 (8), 63 (9).

[13] Cal. Evid. Code § 1220 (Deering 1966); Fla. Stat. Ann. § 90. 803 (18) (West 1979); Hawaii Rev. Stat. c. 626, Rule 803 (a) (1983 Supp.); Kan. Stat. Ann. § 60-460 (g) (1976); *People* v. *Wheelwright*, 262 Cal. App. 2d 63, 69, 68 Cal. Rptr.

Eighteen other states and the federal courts consider admissions to be a separate category of substantive evidence which is not hearsay at all.[14]

In *State* v. *Villafane,* supra, 674, upon which the defendant relies, we stated without comment a definition of an admission which previously had been announced only as dicta in two civil cases.[15] Because we found in *Villafane* that the admitted statement was inconsistent with the defendant's position at trial and therefore admissible, we discussed the claim of error in one paragraph and made no attempt to analyze the basis for or effect of the rule we announced. An analysis of the differences between civil and criminal trials indicates that in *Villafane* our reliance on civil precedents to define admissions in criminal proceedings was misplaced.

356 (1968); *Pendergrass* v. *State,* 245 Ga. 626, 627, 266 S.E.2d 225 (1980); *Martinez* v. *State,* 90 Idaho 229, 231–33, 409 P.2d 426 (1965); *People* v. *Richardson,* 21 Ill. 2d 435, 439, 172 N.E.2d 801 (1961); *Jethroe* v. *State,* 262 Ind. 505, 511, 319 N.E.2d 133 (1972); *State* v. *Kennedy,* 224 N.W.2d 223 (Iowa 1974); *Dolan* v. *Commonwealth,* 468 S.W.2d 277 (Ky. 1971); *State* v. *Walker,* 344 So. 2d 990, 995 (La. 1977); *Harris* v. *State,* 27 Md. App. 547, 553, 342 A.2d 305 (1975); *Commonwealth* v. *Wood,* 384 Mass. 641, 643–44, 428 N.E.2d 820 (1981); *State* v. *Martineau,* 116 N.H. 797, 799, 368 A.2d 592 (1976); *State* v. *Bowden,* 113 R.I. 649, 663, 324 A.2d 631 (1974); *State* v. *Jones,* 598 S.W.2d 209 (Tenn. 1980); *Land* v. *Commonwealth,* 211 Va. 223, 229, 176 S.E.2d 586 (1970). In seven other states which recognize the admissions exception, this issue has not been clearly addressed. *Trest* v. *State,* 409 So. 2d 906 (Ala. Crim. App. 1981); *State* v. *Thresher,* 350 S.W.2d 1, 9 (Mo. 1961); *State* v. *Rotenberry,* 284 S.E.2d 197 (N.C. App. 1981); *Commonwealth* v. *Evans,* 190 Pa. Super. 179, 246, 154 A.2d 57 (1959), aff'd, 399 Pa. 387, 160 A.2d 407, cert. denied, 364 U.S. 899, 81 S. Ct. 233, 5 L. Ed. 2d 194 (1960); *State* v. *Plyler,* 275 S.C. 291, 295, 270 S.E.2d 126 (1980); *Spradling* v. *State,* 628 S.W.2d 123, 125 (Tex. Crim. App. 1981); *State* v. *Wilson,* 294 S.E.2d 296, 298 (W. Va. 1982).

[14] A compilation of states following the Federal Rules of Evidence, including notations of variations from the original text, may be found in 1 Weinstein's Evidence, State Adaptations of the Federal Rules of Evidence (1982). Federal Rule of Evidence 801 (d) (2) is compiled at T. 115–123.

[15] In *Johnson* v. *Rockaway Bus Corporation,* 145 Conn. 204, 209, 140 A.2d 708 (1958), the statements at issue had been offered as declarations against interest and excluded by the trial court. This court's statement that "the

In a civil case each party files pleadings which are conclusive as to matters admitted therein; *Hirsch* v. *Thrall*, 148 Conn. 202, 206–207, 169 A.2d 271 (1961); each may be required to submit to extensive pretrial discovery; Practice Book §§ 219–249; and each may be called to testify by the opposing party. A party's full position at trial is therefore readily ascertainable. Thus, a requirement that the proffered admission be contradictory with that position is not an obstacle to the admissibility of an admission in a civil trial.

In a criminal trial, however, the defendant is not required to take any particular position at trial. The privilege against compulsory self-incrimination permits the defendant to stand mute and to force the state to prove guilt beyond a reasonable doubt.[16] There is no responsive pleading required. The defendant cannot be forced to testify or to present any evidence. In a case where the defendant chose not to present any evidence, the rule in *Villafane* would make it impossible for the state to introduce extra-judicial statements by the defendant which were not tantamount to full confessions of guilt, because it could not show that the statements were contradictory to the defendant's trial position.

---

admissibility of the evidence as an admission by [the defendant] . . . would depend upon whether [the] claimed admission was inconsistent with claims made by him on the trial . . .'' was purely dictum used to illustrate that the court had not considered the proffered statements under the admissions exception. *Hill* v. *Small*, 129 Conn. 604, 605, 30 A.2d 387 (1943), cited as authority both in *Johnson* v. *Rockaway Bus Corporation*, supra, and in *State* v. *Villafane*, 171 Conn. 644, 674, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), states only that a contradictory statement made out of court by a party may be treated as an admission. That case in no way limits admissions to statements contradictory of a position taken at trial. In sum, the definition of an admission in *Villafane* is based on dictum in *Rockaway*, which dictum was not even supported by the authority cited therein.

[16] A plea of "not guilty" is insufficient to define the defendant's position at trial. Such a plea does not necessarily claim that the defendant is inno-

The privilege against self-incrimination extends only to statements which are compelled by the government. It does not protect against disclosure of statements voluntarily made to agents of the government or of statements made to third parties. *State* v. *Barlow,* 177 Conn. 391, 395, 418 A.2d 46 (1979); *State* v. *Zeko,* 176 Conn. 421, 425, 407 A.2d 1022 (1979). Yet the rule announced in *Villafane* would permit a defendant to shield such statements behind the privilege whenever the defendant decided not to present a defense. We are presented with no persuasive reason why the privilege should be thus enlarged to exclude from the trier of fact, at the option of the defendant, reliable and probative evidence of voluntary statements made by the defendant. To the extent that language in *State* v. *Villafane,* supra, 674, permits such an extension, it is overruled.

In the case before us, the defendant's statements to the officers acknowledged, inter alia, that he was in the victim's home on the day of the murder at times during which it may have occurred and that he had consumed alcoholic beverages with the victim. These are facts and circumstances "pertinent to the issue and tending, in connection with proof of other facts, to prove his guilt." *People* v. *Richardson,* 21 Ill. 2d 435, 439, 172 N.W.2d 801 (1961). They were therefore admissions, and the trial court did not err in admitting them as exceptions to the hearsay rule. *People* v. *Wheelwright,* 262 Cal. App. 2d 63, 69, 68 Cal. Rptr. 356 (1968); *Pendergrass* v. *State,* supra; *Martinez* v. *State,* 90 Idaho 229, 231, 409 P.2d 426 (1965).

cent of the crime charged, but rather states the defendant's position that the state cannot prove beyond a reasonable doubt that the defendant committed the crime charged.

## VI

### SUFFICIENCY OF THE EVIDENCE

The defendant's final claim is that the trial court erred in denying his motions for judgment of acquittal and for a new trial because the evidence was insufficient to support his guilt beyond a reasonable doubt. We disagree.

"When a verdict is challenged because of insufficient evidence, the issue is whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Ruiz,* 171 Conn. 264, 276–77, 368 A.2d 222 (1976); *State* v. *Benton,* 161 Conn. 404, 407, 288 A.2d 411 (1971). It is the province of the jury to draw reasonable and logical inferences from the facts proved. *State* v. *Williams,* 169 Conn. 322, 336, 363 A.2d 72 (1975). There is no distinction between direct and circumstantial evidence so far as probative force is concerned; *State* v. *Cari,* 163 Conn. 174, 179, 303 A.2d 7 (1972); and the evidence must be given a construction most favorable to sustaining the jury's verdict. *State* v. *Brown,* 169 Conn. 692, 695, 364 A.2d 186 (1975)." *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); see *State* v. *Ferrell,* 191 Conn. 37, 46, 463 A.2d 573 (1983). We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. See *State* v. *Martin,* 189 Conn. 1, 9, 454 A.2d 256 (1983); *Kaplan* v. *Kaplan,* 186 Conn. 387, 391, 441 A.2d 629 (1982); *State* v. *Festo,* 181 Conn. 254, 260–61, 435 A.2d 38 (1980).

The jury had before it evidence that the defendant had been in the victim's house on the day of the crime, and that his truck had been seen there as late as 11:30 a.m. The medical examiner's opinion was that the death occurred closer to the morning hours than to the afternoon. Blood which tested as the victim's blood type was found on the defendant's trousers, on his shoes, and on the steering wheel of his truck. A beer can of the same unusual size that the defendant had bought on the day of the murder was found in the bedroom near the victim's body. When the defendant was asked about sharing a beer with the victim, he became angry and terminated an interview with the state police. Although in a statement made on the night of the murder the defendant had limited his presence at the victim's house to the period from 9:30 to 9:50 a.m., there was other testimony indicating that the defendant's statement was untrue.

From all of the evidence the jury reasonably could have concluded that the defendant killed the victim. Although the defendant presented expert opinion evidence which the state never attempted to refute that the tests of the bloodstains could have been inaccurate and that the stains may have been the defendant's own blood, the jury was not required to conclude that the defendant's theory was correct, that the state's test results were incorrect, or that the blood was not that of the victim. The state's case was necessarily based on circumstantial evidence. Viewing the evidence in the light most favorable to sustaining the verdict, however, we cannot say as a matter of law that the jury could not have found the defendant guilty of murder beyond a reasonable doubt.

There is no error.

In this opinion the other judges concurred.